UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>  )<br> Plaintiff(s), )<br>  )<br> vs. )<br>  )<br>ROBERT E. SIMMONS, )<br>  )<br> Defendant(s). ) | Case No. 1:11CR 112 SNLJ<br>                    (LMB) |

**REPORT AND RECOMMENDATION**

Robert E. Simmons filed his Motion to Suppress Evidence and Statements (Document #26) arguing that several of his constitutional rights were violated. Mr. Simmons contends that his vehicle was stopped without probable cause and was searched without his consent. Mr. Simmons contends that his statement to ATF Special Agent David Diveley should be suppressed because it was the result of an unlawful arrest, because the statement was involuntary, because it was coerced and because no Miranda warnings were given to Mr. Simmons before the statement was taken. The government denies that Mr. Simmons's constitutional rights were violated in connection with his arrest and interview.

**Factual Background**[1]

On May 4, 2011, officers with the Southeast Missouri Drug Task Force were involved in an illegal drug distribution investigation that involved a house in Cape Girardeau, Missouri. Missouri State Highway Patrol Officer Mike Alford, who is assigned to the Drug Task Force, and Cape

---

[1]The majority of the Factual Background is taken from the FACTS section in Document #29, Government's Response to Simmons' Motion to Suppress Evidence and Statements.

Girardeau Police Detective Jason Young were watching this particular home to determine if it was involved in the drug trade. The officers had received information from informants that drugs were being sold from this house. The officers observed several people driving to the home and staying for only a short period of time. The officers knew that this pattern of short visits to the home is indicative of drug sales. One vehicle had been stopped after leaving the home. The driver was interviewed and confirmed that drugs were being sold at the home. The officers continued to watch the home to gather more information about the activities there.

Shortly after 11:00 P.M., Alford and young observed a silver PT Cruiser drive up to the home. The driver and a passenger went inside the home. The officers were able to read the license plate of that car and called it in to their dispatcher to try to identify the driver. The dispatcher informed Alford and Young that the PT Cruiser was a rental vehicle. Alford and Young knew from their previous experience that drug suppliers often deliver their drugs to street level dealers in rental cars. When the driver and passenger came out of the home, they entered the PT Cruiser and drove away. Both Alford and Young observed that the PT Cruiser did not stop at a stop sign after it left the home. The officers called their dispatcher and requested that a patrol car be sent to the area to stop the PT Cruiser for the traffic violation.

Cape Girardeau Police Officers Brandon Farmer and William Underwood were patrolling in an area near where Alford and Young were located. They received the request and drove to make the traffic stop. Farmer and Underwood were able to get behind the PT Cruiser and activate their patrol vehicle's emergency lights. The PT Cruiser pulled over. Alford and Young had followed the PT Cruiser from the house to the scene of the traffic stop. They parked and watched as the patrol officers made their contact.

Officer Brandon Farmer walked up to the driver's door and made contact with the driver, Robert Simmons. Farmer had previous dealings with Simmons and knew that Simmons was involved in the illegal drug business and was known to carry firearms. Farmer had previously been involved with a criminal case where Simmons was apprehended with a quantity of cocaine base. He also knew that Simmons had previously worked as a drug informant for Alford. Farmer has a standard procedure where he asks people that he stops if they have anything on them that could hurt Farmer and could he pat them down. Farmer asked these questions of Simmons. Simmons said that he didn't have anything on him that would hurt Farmer and that Farmer could pat him down. Nothing was discovered during the pat-down of Simmons.

The passenger was identified as Jerome Bridges. He was asked the same questions and gave the same responses. Nothing was discovered during his pat-down. Farmer asked Simmons if Simmons had anything illegal in the car. Simmons replied that he did not know what was in the car because the car was his sister's rental vehicle.

Farmer then asked Simmons for consent to search the vehicle. Simmons told the officer he could search the car. Farmer walked over to the passenger door and looked in the car. He observed a handgun under the passenger seat of that vehicle. It was a Jimenez, .380 caliber pistol. Farmer also saw a clear plastic baggy of marijuana in the center console cup holder. Those two items were seized. The car was then towed and impounded. It was searched pursuant to the department's tow and inventory policy. Nothing else was seized from the car. Both Simmons and Bridges were arrested for possession of the firearm as felons and for possession of the marijuana. Simmons was also arrested for failing to stop at a stop sign and for felony driving a vehicle while his driver's privileges were revoked.

On May 5, 2011, ATF SA David Diveley and Cape Girardeau Police Detective Brian Vassalli met with Simmons while he was still in custody. Diveley administered a <u>Miranda</u> warning to Simmons. Simmons said that he understood his rights.

Simmons told Diveley that he had previous felony convictions in Missouri. Simmons said that the Jimenez pistol belonged to him. Simmons said that, on the night of May 4, 2011, he and Jerome Bridges were looking for someone that Bridges was having a feud with. Simmons did not identify who that person was. Simmons denied that they were going to use the pistol to assault this person. Simmons said that he got the pistol around April 30, 2011, from Shalimar Ross. He said that he got this pistol from Ross at Ross's residence in the 700 block of South Ellis Street in Cape Girardeau. Simmons said that he and Ross have known each other all their lives and that Simmons did not have to pay for the pistol.

Diveley attempted to record this interview, but the recorder malfunctioned. There is no recording of this interview.

## **The Stop**

The defendant asserts that "The officers did not have probable cause to stop the vehicle, in that the defendant did not fail to stop, which was the suggested probable cause violation." (Document #26, p. 2).

Officer Jason Young of the Cape Girardeau Police Department currently attached to the Southeast Missouri Drug Task Force and another officer of the Drug Task Force, Mike Alford, were keeping a house at 41 South Hanover Street in Cape Girardeau under surveillance. They had been advised by different confidential informants and officers of the Cape Girardeau Police Department

that there was a lot of what the CI's and other officers considered narcotics activity at that house. (Tr. 5). "A lot of traffic in and out. People pulling up in front of the house, in and out in a very short period of time." Id. Young and Alford were in an unmarked car just down the street from 41 South Hanover. (Tr. 5, 6). Young and Alford observed a PT Cruiser pull up along side of the house. Two black males exited the vehicle at the residence at 41 South Hanover and entered the home. They were in there for a short period of time. Officer Mike Alford moved the officers' car up to where they could get a view of the license plate on the vehicle. Dispatch informed them that the car was registered to Enterprise Leasing. (Tr. 7). The two came back out of the house, entered the vehicle and began driving away from the location. (Tr. 8). The officers observed the PT Cruiser commit a stop sign violation at the corner of Walnut and Pacific. They notified Officer Brandon Farmer of the traffic violation and asked that Farmer stop the PT Cruiser. Alford and Young maintained visual contact with the PT Cruiser until Farmer was at the scene. Officer Farmer was in an unmarked patrol car. Patrolman Farmer made contact with the driver, who was Mr. Simmons. Farmer was accompanied by Patrolman William Underwood, who made contact with the passenger, Jerome Bridges. (Tr. 8-10). Neither of the occupants had a valid driver's license. The decision to stop a vehicle is reasonable when the police have probable cause to believe that a traffic violation has occurred. United States v. Adler, 590 F.3d 581, 583 (8th Cir. 2009) citing Whren v. United States, 517 U.S. 806, 810, 116 S.Ct. 1769 (1986). Any traffic violation, however minor, provides probable cause for a traffic stop. Adler, 590 F.3d at 581. The officers had probable cause to stop the PT Cruiser driven by Mr. Simmons.

**Consent to Search**

In his motion to suppress, the defendant alleges that "Defendant did not consent to a search of the vehicle he was driving as was alleged in the detention affidavit in this case. The search was made without valid consent and without a valid search warrant." (Document #26, p. 1). Patrolman William Underwood testified he accompanied Officer Farmer during the stop of Mr. Simmons and Mr. Bridges. The PT Cruiser came to a stop at the 700 block of South Pacific. Officer Farmer turned on his emergency lights, and the officers parked behind the PT Cruiser approximately 10 to 15 feet away. Mr. Simmons exited the vehicle. The officers told the two occupants of the Cruiser why they were stopping them. Officer Farmer asked Mr. Simmons, the driver, for consent to search the vehicle. When asked what Mr. Simmons had to say in response to the request, Officer Underwood answered, "I don't remember his exact words, but he did not object at any time I was there." (Tr. 29).

A little later in his testimony, Officer Underwood was asked,

Q. So would it be fair to say you didn't remember what words for the consent that Mr. Simmons used, but it was something along that line?

A. I don't remember the exact words, but at no point did any of the - - the driver or the passenger object to the search while we were there.

Q. Okay. And then Mr. Farmer did search the vehicle; is that right?

A. That's correct.

Q. And did he find anything in the vehicle that was seized?

A. He found a small bag of a green leafy substance and a firearm.

Q. And did the green leafy substance look like any material?

A. It appeared to be marijuana.

(Tr. 30).

On cross-examination, Officer Underwood was asked about the consent.

Q. And you say he gave consent, but actually I think you testified that no one objected, and is that accurate?

A. No one - - when I was speaking with him and Patrolman Farmer searched the vehicle, no one objected to anything that was going on at that time.

Q. Could you hear Patrolman Farmer ask Mr. Simmons for consent?

A. I know he did. I don't remember the exact wording, the entire conversation.

Q. Could you hear Mr. Simmons say anything in response?

A. I assume he said - - I believe he said, Yes.

Q. But that's an assumption; correct? Could you physically hear him say yes or do you - -

A. I know he said yes, but I can't put the whole conversation into context.[2]

(Tr. 37-38).

After the parties completed their examination and cross-examination of Officer Underwood, the court asked Officer Underwood about the consent.

    THE COURT: Did you hear any response to Officer Farmer's request to search the car?

    THE WITNESS: I know he said yes, but I do not remember the exact

---

[2]Officer Brandon Farmer who asked for Mr. Simmons's consent was not available to testify at the evidentiary hearing. Officer Young testified Brandon Farmer was in training at another law enforcement academy for the Border Patrol. (Tr. 10).

response.

>THE COURT: He did say yes?

>THE WITNESS: I believe he said yes.

(Tr. 43).

When Officer Farmer asked for consent, both he and Simmons were outside the vehicles on the other side of the PT Cruiser near the middle of the vehicle, whereas Officer Underwood was at the back bumper of the PT Cruiser. Officer Underwood was "5 to 8 feet I'd say. That's within the vehicle." (Tr. 43).

The court finds by the preponderance of the evidence that Mr. Simmons verbally consented to the search of the PT Cruiser.

Officer Underwood could not remember the exact words Robert Simmons used in response to Officer Farmer's request to search. He was sure, that when the search took place, no one objected. (Tr. 29, 30, 37).

## **Implied Consent**

In addition to express consent, consent may be implied by a person's failure to object to the search. United States v. Morales, 861 F.2d 396, 399-400 (3rd Cir. 1988) (consent implied because passenger lessee of rental car remained silent after driver consented and search occurred); United States v. Jones, 356 F.3d 529, 534 (4th Cir. 2004) (consent implied because defendant did not object to agents' opening of sealed boxes inside duffle bag); United States v. Mendoza-Gonzalez, 318 F.3d 663, 667-70 (5th Cir. 2003) (consent implied because defendant did not object to agents' opening of sealed boxes inside trailer); United States v. Wesela, 223 F.3d 656, 661 (7th Cir. 2000) (consent implied because defendant's wife called police to home, did not object to search as it occurred, and

provided information to police while they searched); <u>United States v. Esparza</u>, 162 F.3 978, 980 (8th Cir. 1998) (consent implied because defendant did not respond to police knocking on door and request for entry though door was locked); <u>United States v. Patten</u>, 183 F.3d 1190, 1195 (10th Cir. 1999) (consent implied to search inside suitcase because defendant silently and without objection unzipped suitcase); <u>United States v. Dunkley</u>, 911 F.2d 522, 525-26 (11th Cir. 1990)(per curiam)(consent implied because passenger lessee of rental car remained silent after driver consented to search of vehicle).

The court believes Simmons verbally consented to the search (even though Officer Farmer was not available to testify); the evidence also supports the implied consent of Simmons and Bridges because, as Officer Underwood testified, they did not object to the search as it took place.

### **Inevitable Discovery**

However, should a higher court find that Officer Underwood's testimony was ambiguous, and if the rationale of implied consent be rejected, the contraband would have been inevitably discovered.

Neither of the occupants of the PT Cruiser had a valid driver's license. The policy of the Cape Girardeau Police Department is that if the driver does not have a valid license, the vehicle will be towed. (Tr. 11). The driver's license of Mr. Simmons was revoked. (Tr. 31). Officer Young testified that he had been dealing with Mr. Bridges for quite some time; and as long as he knew him, he has never had a driver's license. Officer Young testified that Mr. Bridges uses a different form of identification. He always gives new officers that he's never dealt with his DOC card. (Tr. 12).

The car rental companies advise officers that the only person that should be driving the car

is on the listed paperwork that is given to that person, that is, the person who leased the car. It was actually Mr. Simmons's aunt who leased this car. (Tr. 42). If a car is found to be operated by someone other than persons listed on the lease agreement, the lease companies prefer that the vehicle be towed. In addition, the rental companies always ask officers to search the car before it is towed. (Tr. 13).

Under the circumstances and the testimony at the evidentiary hearing, the PT Cruiser would have been towed both because neither occupant had a valid driver's license and neither occupant was the lessee of the vehicle. In fact, the rental company asks the police to search the car before it is actually towed by the police. (Tr. 13). Officer Underwood testified that "It was rented by his sister or a relative of some sort." (Tr. 32). Under Nix v. Williams, 467 U.S. 431, 444 and 448, 104 S.Ct. 2501 (1984), the automobile would have been searched when it was towed. Thus, the evidence in the car would have been inevitably discovered in any event by lawful means. United States v. Halls, 40 F.3d 275, 276 (8th Cir. 1984).

The search of the automobile was legal, either by verbal consent of Mr. Simmons, his implied consent or the inevitable discovery doctrine when the inventory search was conducted following the towing of the vehicle.

### **Defendant's Statements**

Defendant claims in his Motion to Suppress Evidence and Statements that "Any oral or written statements as may have been made by the defendant were involuntary, were elicited by coercion and/or were elicited without the defendant being fully advised of and afforded his rights under the Fifth Amendment of the United States Constitution, and said statements are therefore involuntary and inadmissible." (Document #26, p. 2).

Special Agent David Diveley of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified. He interviewed Mr. Simmons on May 5, 2011, at the Cape Girardeau Police Department. He was accompanied by Officer Brian Vassalli of the Cape Girardeau Police Department.

When Mr. Simmons was brought into the interview room on the second floor of the Police Department, Agent Diveley and Officer Vassalli identified themselves and told Mr. Simmons they wanted to talk to him about the gun that was found in his vehicle the night before by the officers. At that time, Agent Diveley read Mr. Simmons his Miranda warnings. Mr. Simmons stated he understood his rights, and the interview proceeded. (Tr. 47-48). The Miranda warnings or rights were read from a pre-printed card that Agent Diveley carries with him at all times. (Tr. 48). At the evidentiary hearing, Agent Diveley read into the record the rights he gave to Mr. Simmons the afternoon of May 5, 2011. (Tr. 48-49).

The defendant stated that the gun was his and that he received it from an individual by the name of Shalimar Ross. (Tr. 49).

Agent Diveley testified that he was aware that Shalimar Ross had previously been convicted of a felony and agents were trying to build a case on Mr. Ross by getting information about his possession of a firearm. Mr. Simmons agreed to help the agents to try to catch Shalimar Ross with a gun. (Tr. 50). Mr. Simmons had previously worked as an informant with other officers, Dan Seger and Bill Bohnert.

Simmons did call later to give information to Agent Diveley, approximately four or five times. (Tr. 51). Diveley testified that none of the information supplied by Simmons was such that it could be acted on with respect to Shalimar Ross. When Robert Simmons was arrested for Domestic Assault, Agent Diveley determined that he could not use Mr. Simmons as a confidential informant.

Agent Diveley was asked about the tenor of the interview. Agent Diveley replied that "It was conversation just like we're talking right here." (Tr. 52). No threats were made, no promises were made to Mr. Simmons about benefits he might receive, no statements were made by Agent Diveley to induce Simmons's statement, that if he talked to Diveley he would get any benefit out of it. Id.

During the interview, Mr. Simmons admitted the gun was his very quickly, and when Shalimar Ross came up, then they started getting into a conversation about Simmons's helping the officers. He had already admitted that the gun was his. (Tr. 53).

Mr. Simmons appeared to be competent in Diveley's view of him. Mr. Simmons appeared to be functioning well and thinking well. He answered the questions appropriately and did not appear to be angry with Agent Diveley or any of the other officers. (Tr. 53). Diveley testified the interview lasted about twenty minutes. (Tr. 55).

Mr. Simmons never asked to talk to an attorney during the interview. The interview terminated with the officers agreeing to try to get Simmons out on the street so that he could help himself help them. (Tr. 55). The officers attempted to record the interview, but the equipment malfunctioned so there was no recording of it.

The defendant presented no evidence at the evidentiary hearing. (Tr. 60).

In <u>United States v. Astello</u>, 241 F.3d 965, 966 (8th Cir. 2001), the Court held that the appropriate test for determining the voluntariness of a confession is whether the confession was extracted by threats, violence, or by direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired. Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled, despite the fact that

law enforcement authorities adhered to the dictates of Miranda, are rare. Id., citing Berkemer v. McCarty, 468 U.S. 420, 433, 104 S.Ct. 3138 (1984). The Supreme Court has held that "Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515 (1986).

The court finds there was no coercive activity employed against Mr. Simmons to get him to give his statement. It followed the administering of the Miranda warnings which Mr. Simmons acknowledged he understood.

The court finds the defendant's statement was voluntary, was made after a waiver of his rights, and that no coercion was employed by the officers. His will was not overborne. Accordingly, Robert Simmons's statement is admissible at trial.

Finally, the defendant claims that his statement was elicited as a result of an unlawful arrest making it inadmissible. The court has already found the defendant's arrest was valid based upon a traffic violation, Possession of a Controlled Substance and Driving Without a Valid Driver's License.

**IT IS HEREBY RECOMMENDED** that defendant's Motion to Suppress Evidence and Statements (Document #26) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time

for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

                                                   /s/ Lewis M. Blanton
                                                   LEWIS M. BLANTON
                                                   UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of April, 2012.